UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMAZON.COM SERVICES LLC, | Case No. 1:25-cv-05311- EK-MMH |
| Plaintiff, | |
| -against- | |
| N.Y. STATE PUBLIC EMPLOYMENT RELATIONS BOARD, *et al*, | |
| Defendants. | |

**AMICUS BRIEF OF**
**NATIONAL FEDERATION OF INDEPENDNET BUSINESS (NFIB)**
**SMALL BUSINESS LEGAL CENTER;**
**ASSOCIATED BUILDERS AND CONTRACTORS (ABC);**
**ASSOCIATED GENERAL CONTRACTORS, NEW YORK STATE; BUSINESS**
**COUNCIL OF NEW YORK STATE, INC., THE CHAMBER OF COMMERCE OF THE**
**UNITED STATES OF AMERICA AND**
**WASHINGTON LEGAL FOUNDATION (WLF)**

Eli Freedberg
LITTLER MENDELSON, P.C.
900 Third Avenue, 8th Floor
New York, NY 10022
212.583.9600
efreedberg@littler.com

*Attorneys for Amici*

# TABLE OF CONTENTS

**PAGE**

INTERESTS OF AMICI.................................................................................................. 1

PRELIMINARY STATEMENT ..................................................................................... 3

ARGUMENT .................................................................................................................. 6

    1.    Section 715 of the NLRA, as amended, is exclusive even
when the NLRB cannot or will not exercise jurisdiction.................... 6

    2.    As amended, section 715 will sow chaos in national labor
markets............................................................................................... 12

# TABLE OF AUTORITIES

**PAGES**

**Cases**

*Aetna Freight Lines v. Clayton,*
228 F.2d 384 (2d Cir. 1955)........................................................................4

*Allis-Chalmers Corp. v. Lueck,*
471 U.S. 202 (1985)..............................................................................6, 13

*Amalgamated Util. Workers v. Consol Edison Co. of N.Y.,*
309 U.S. 264 (1940)..................................................................................4

*Bethlehem Steel Co. v. N.Y. State Lab. Rels. Bd.,*
330 U.S. 767 (1947)..........................................................................7, 9, 11

*Garner v. Teamsters, Chauffeurs & Helpers Loc. Union No. 776,*
346 U.S. 485 (1953)........................................................................5, 6, 7

*Guss v. Utah Lab. Rels. Bd.,*
353 U.S. 1 (1935)............................................................................*passim*

*Hill v. State of Fla. ex rel. Watson,*
325 U.S. 538 (1945).................................................................................7

*La Crosse Tel. Corp. v. Wis. Emp. Rels. Bd.,*
336 U.S. 18 (1949)..................................................................................3

*Machinists & Aerospace Workers v. Wisconsin Empl. Relations Comm'n,*
427 U.S. 132 (1976).................................................................................3

*Merck Sharp & Dohme Corp. v. Albrecht,*
587 U.S. 299 (2019).................................................................................1

*New Process Steel, L.P. v. National Labor Relations Board,*
560 U.S. 687 (2010)...............................................................................12

*NLRB v. Comm. of Interns & Residents,*
566 F.2d 810 (2d Cir. 1977).............................................................*passim*

*NLRB v. Gissel Packing Co., Inc.,*
395 U.S. 575 (1969)...............................................................................14

*NLRB v. Nash-Finch Co.,*
404 U.S. 138 (1971).................................................................................4

*San Diego Bldg. Trades Council v. Garmon,*
359 U.S. 236 (1959).........................................................................*passim*

**TABLE OF AUTHORITIES**
**(CONTINUED)**

**PAGES**

*Viking River Cruises, Inc. v. Moriana*,
　142 S. Ct. 1906 (2022) ........................................................................................1

*Weber v. Anheuser-Busch, Inc.*,
　348 U.S. 468 (1955) ............................................................................................7

*Wis. Dep't of Indus., Labor & Human Relations v. Gould Inc.*,
　475 U.S. 282 (1986) .........................................................................................3, 5

**Statutes**

29 U.S.C. § 151 ..................................................................................................5, 8

29 U.S.C. § 153 ...................................................................................................12

29 U.S.C. § 153(b) ................................................................................................4

29 U.S.C. § 158(c) ..............................................................................................13

29 U.S.C. § 159 ....................................................................................................8

29 U.S.C. § 159(c) ..............................................................................................14

29 U.S.C. § 160 ....................................................................................................8

29 U.S.C. § 160(a) ...........................................................................................4, 5, 9

29 U.S.C. § 164(c) ...........................................................................................5, 10

29 U.S.C. § 411(a) ..............................................................................................14

29 U.S.C. § 414 ..................................................................................................14

29 U.S.C. § 415 ..................................................................................................14

A.B. 1340 (Cal. 2025) .........................................................................................14

A.B. 288 (Cal. 2025) ...........................................................................................14

Cal. Lab. Code § 740.8(a)(1)(B) .........................................................................14

Cal. Lab. Code § 1475 ........................................................................................14

Cal. Lab. Code § 1475(a)(3)-(4) .........................................................................14

FLSA § 14(c) .................................................................................................5, 10

N.Y. Lab. Law § 702-a(1) ...................................................................................13

## TABLE OF AUTHORITIES
### (CONTINUED)

**PAGES**

N.Y. Lab. Law § 704(11)................................................................................13

N.Y. Lab. Law § 715 ............................................................................... *passim*

National Labor Relations Act (NLRA)...................................................... *passim*

NLRA § 7................................................................................................7

NLRA § 8................................................................................................7

NLRA § 10(a) ........................................................................................ *passim*

Pub. L. 74-198, § 3(b), 49 Stat. 499, 451 (1935) ............................................4

Pub. L. 80-101, § 10, 61 Stat. 136, 146 (1947)...............................................9

Pub. L. No. 74-198, § 1, 49 Stat. 449, 449 (1935).............................8, 12, 14

S8034A (N.Y. 2025) .......................................................................3, 4, 11

Taft-Hartley Act........................................................................................6

Wagner Act of 1935 ..................................................................................8

**Other Authorities**

Alexander T. MacDonald, *Be Careful What You Wish For: The Risks of Competitive Labor Federalism for Pro-Union States*, Federalist Soc'y (June 2, 2025), https://fedsoc.org/commentary/fedsoc-blog/be-careful-what-you-wish-for-the-risks-of-competitive-labor-federalism-for-pro-union-states................6

Eric Blanc, *Revisiting the Wagner Act & Its Causes*, Lab. Politics (July 28, 2022) ....................7

H.R. Rep. No. 510 (1947)..........................................................................9

H.R. Rep. No. 969, 74th Cong., 1st Sess. (1935) ..........................................5

: https://www.cato.org/regulation/spring-2014/striking-success-nlra#conclusion ........................5

: https://www.laborpolitics.com/p/revisiting-the-wagner-act-and-its ...............................8

: https://www.nysenate.gov/legislation/bills/2025/S8034/amendment/A................................4, 11

Michael Wachter, *The Striking Success of the NLRA*, Regulation (Spring 2014) ..........................5

**TABLE OF AUTHORITIES**
**(CONTINUED)**

**PAGES**

Nominations of Scott Mayer to Be a Member of the National Labor Relations
Board, James Murphey to Be a Member of the National Labor Relations
Board, and Rosario Palmieri to Be Assistant Secretary of Labor for Policy,
U.S. Senate Health, Educ., Lab. & Pensions Committee,
https://www.help.senate.gov/hearings/nominations-of-scott-mayer-to-be-a-
member-of-the-national-labor-relations-board-james-murphy-to-be-a-
member-of-the-national-labor-relations-board-and-rosario-palmieri-to-be-
assistant-secretary-of-labor-for-policy (setting hearing for Oct. 1, 2025)...............11

Order Delegating Authority to the General Counsel,
756 Fed. Reg. 69768, 69768 (Nov. 9, 2011)............................................................11

Press Release, Acting General Counsel Statement on Potential State Legislation
Regulating Private Sector Labor Relations, NLRB Office of Pub. Affairs
(Aug. 15, 2025), https://www.nlrb.gov/news-outreach/news-story/acting-
general-counsel-statement-on-potential-state-legislation-regulating.......................11

S. Rep. No. 573, 74th Cong., 1st Sess. (1935)......................................................*passim*

S. Rep. No. 1184, 79th Cong., 2d Sess. (1934) ...........................................................8

*U.S. Chamber of Commerce* ........................................................................................13

U.S. Const. art. VI, cl. 2..........................................................................................4, 12

# INTERESTS OF AMICI[1]

The National Federation of Independent Business Small Business Legal Center, Inc. (NFIB Legal Center) is a nonprofit, public interest law firm established to provide legal resources and be the voice for small businesses in the nation's courts through representation on issues of public interest affecting small businesses. It is an affiliate of the National Federation of Independent Business, Inc. (NFIB), which is the nation's leading small business association. NFIB's mission is to promote and protect the right of its members to own, operate, and grow their businesses. NFIB represents, in Washington, D.C., and all 50 state capitals, the interests of its members.

Associated Builders and Contractors (ABC) is a national construction industry trade association representing more than 23,000 members. Founded on the merit shop philosophy, ABC and its 67 chapters help members develop people, win work, and deliver that work safely, ethically, and profitability for the betterment of the communities in which ABC its members work. ABC's membership represents all specialties within the U.S. construction industry and comprises primarily firms that perform work in the industrial and commercial sectors.

Washington Legal Foundation (WLF) is a nonprofit, public-interest law firm and policy center with supporters nationwide, including many in New York. WLF promotes free enterprise, individual rights, limited government, and the rule of law. It often appears as an amicus in important preemption cases to help ensure that federal law operates uniformly and efficiently, as Congress intended. *See, e.g., Viking River Cruises, Inc. v. Moriana*, 142 S. Ct. 1906 (2022); *Merck Sharp & Dohme Corp. v. Albrecht*, 587 U.S. 299 (2019).

AGC NYS is a not-for-profit entity that is a product of a combination of two other construction industry trade associations. As such, AGC NYS has two parent corporations: The

---

[1] *Amici curiae* state that no counsel for any party authored this brief in whole or in part and no entity or person, aside from *amici curiae*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

General Building Contractors of New York State, Inc. and Associated General Contractors of America New York State Chapter, Inc.

The Business Council of New York State, Inc. ("Business Council") is a leading business organization in New York, representing the interests of more than 3,000 member businesses statewide. Its membership is comprised of both large and small businesses, with varying degrees of sophistication in state and local tax matters. The Business Council's primary function is to serve as an advocate for its members to promote a healthier climate for business and economic development.

The Chamber of Commerce of the United States of America is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files amicus curiae briefs in cases, like this one, that raise issues of concern to the nation's business community.

Amici are committed to a rational, orderly, and fair systems of law, including labor law. They therefore have grave concerns with New York Labor Law section 715, as amended, which threatens to splinter national cohesion in labor law by transferring federal jurisdiction from the NLRB to a state agency. As this brief explains, such a transfer would contradict the basic design of federal labor policy, which channels labor disputes into a single, orderly, uniform system. The transfer would also sow chaos in national labor markets by opening the door to more state-by-state experimentation. Amici submit this brief to help the Court evaluate that risk—a risk that is already playing out across the country.

## PRELIMINARY STATEMENT

For nearly a century, the law of private-sector labor relations has been federal law. When Congress enacted the National Labor Relations Act (NLRA) in 1935, it established a comprehensive, uniform, and exclusive regulatory system. And to manage that system, it created the National Labor Relations Board (NLRB), a federal agency empowered to develop labor policy at the national level. The NLRA was always meant to be exclusive, and the NLRB always meant to be authoritative. When the NLRA applies, it preempts all state and local law. And when the NLRB has jurisdiction, it displaces all state and local agencies. *See, e.g.*, *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 246 (1959); *Machinists & Aerospace Workers v. Wisconsin Empl. Relations Comm'n*, 427 U.S. 132, 149 (1976); *Wis. Dep't of Indus., Labor & Human Relations v. Gould Inc.*, 475 U.S. 282 (1986); *La Crosse Tel. Corp. v. Wis. Emp. Rels. Bd.*, 336 U.S. 18, 26 (1949). *See also* S. Rep. No. 573, at 85, 74th Cong., 1st Sess. (1935) ("[The NLRA] gives the National Labor Relations Board exclusive jurisdiction to prevent and redress unfair labor practices, and . . . establishes clearly that this bill is paramount over other laws that might touch upon similar subject matters.").

Against that near century of unbroken authority, New York now stands in open defiance. The state has amended section 715 of the New York Labor Law to give a state agency, the Public Employee Relations Board (PERB), authority over most private-sector employees—including those subject to the NLRA. *See* S8034A (N.Y. 2025) (amending N.Y. Lab. Law § 715). Section 715 now also authorizes PERB to retain that authority unless and until the NLRB "successfully asserts jurisdiction." *Id.* And worse, to "successfully" assert jurisdiction, section 715 now requires the NLRB to go to court and get a judicial order ousting the PERB. Only then does section 715 allow the NLRB to restore the status quo. *See id.*

This scheme is preempted. Since the NLRA's enactment, the Supreme Court has recognized that the Act has preemptive effect to ensure the NLRB's primary jurisdiction over labor relations and to facilitate development of a uniform national labor law. *Amalgamated Util. Workers v. Consol Edison Co. of N.Y.*, 309 U.S. 264 (1940). The Court has read the Act to implement a Congressional intent to establish a uniform labor law. *NLRB v. Nash-Finch Co.*, 404 U.S. 138, 144 (1971). Congress designed the NLRA as a cohesive unit, one that applies the same way in Albany as it does in Austin. It left no room for the kind of local interference that section 715 now enables. *See* 29 U.S.C. § 160(a); S. Rep. No. 573, at 85; *see also Nash Finch*, 404 U.S. at 144 ("The purpose of the Act was to obtain 'uniform application' of its substantive rules and to avoid the 'diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies.'"); *Aetna Freight Lines v. Clayton*, 228 F.2d 384, 388 (2d Cir. 1955) (recognizing that under the NLRA, "the comprehensive remedy provided by Congress is exclusive").

The state defends this intrusion as a practical necessity: it says that it must act because the NLRB currently lacks a statutory quorum. *See* Sponsor Memo, S8034A (N.Y. 2025)[2] [hereinafter Sponsor Memo] ("Absent a quorum, the Board lacks the power to take meaningful actions, such as issuing decisions in representation and unfair labor practice cases."). But that argument also runs up against the Constitution and congressional intent. The Supremacy Clause mandates that federal law is the "supreme law of the land." U.S. Const. art. VI, cl. 2. When Congress wrote the NLRA, it knew—and indeed intended—that the NLRB would sometimes be unable to act because it lacks a quorum. *See* 29 U.S.C. § 153(b). The quorum requirement has been in place since the beginning, and it has always limited the NLRB's authority in some cases. *See* Pub. L. 74-198, §

---

[2] Available online: https://www.nysenate.gov/legislation/bills/2025/S8034/amendment/A.

3(b), 49 Stat. 499, 451 (1935) (specifying two-member quorum); H.R. Rep. No. 969, 74th Cong., 1st Sess., at 2901 (1935) (same). But Congress never suggested that the lack of a quorum would justify state intervention.

To the contrary, Congress specified only two circumstances where states could act, and neither is present here. First, in section 10(a) of the NLRA, it allowed the NLRB to enter certain cooperative agreements with state agencies. 29 U.S.C. § 160(a). Second, in section 14(c), it allowed state agencies to exercise jurisdiction when the NLRB affirmatively declines to exercise its own. *Id.* § 164(c). And those circumstances are the entire universe in which states may step into the NLRB's otherwise exclusive territory. *Guss v. Utah Lab. Rels. Bd.*, 353 U.S. 1, 9 (1935); *see also NLRB v. Comm. of Interns & Residents*, 566 F.2d 810, 813 n.3 (2d Cir. 1977) ("These provisions are the exclusive means for ceding federal jurisdiction over activities covered by the NLRA."); *Gould*, 475 U.S. at 286 ("[The NLRA] prevents states not only from setting forth standards of conduct inconsistent with the substantive requirements of the NLRA, but also from providing their own regulatory or judicial remedies for conduct prohibited or arguably protected by the Act."). Neither applies here.

Congress's decision to allow only a limited role for states was not accidental. It was a deliberate decision to contain disruption by providing uniformity. The NLRA's first and primary mission is to ensure labor peace. *See* 29 U.S.C. § 151; *Garner v. Teamsters, Chauffeurs & Helpers Loc. Union No. 776*, 346 U.S. 485, 490 (1953). It has performed that intended role, producing a long era of quiescence. *See* Michael Wachter, *The Striking Success of the NLRA*, Regulation (Spring 2014)[3] (concluding that the NLRA as amended "solved the problem of industrial warfare"). It has done that in part because it is predictable and uniform: Parties know what law

---

[3] Available online: https://www.cato.org/regulation/spring-2014/striking-success-nlra#conclusion.

will govern their dispute wherever the dispute arises. But under New York's view, every state could have its own labor law for private-sector workers.[4] Dozens of laws would overlap and collide. Contracts would be harder to negotiate, disputes would be harder to avoid, and disruptions would be harder to contain. The result would be confusion, conflict, and the return of industrial strife. *See, e.g.*, *Garner*, 346 U.S. at 490 ("A multiplicity of tribunals and a diversity of procedures are quite as apt to produce incompatible or conflicting adjudications as are different rules of substantive law."); *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 210 (1985) (observing that divergent local rules would "exert a disruptive influence upon both the negotiation and administration of collective agreements").[5]

Congress did not want that result, and the law does not allow it. This Court should declare section 715 preempted and enjoin its enforcement.

## **ARGUMENT**

### 1. **Section 715 of the NLRA, as amended, is exclusive even when the NLRB cannot or will not exercise jurisdiction.**

As initially enacted, the NLRA protected only the rights of employees to organize and engage in concerted activities, such as collective bargaining. With the passage of the Taft-Hartley Act in 1947, Congress added to the NRLA significant protections for employers and adopted a general code of regulation for labor relations. Shortly thereafter, the Supreme Court explained that: "Congress has taken in hand this particular type of controversy where it affects interstate

---

[4] Indeed, some states, including California, are already following New York's lead. See section 2, infra.

[5] *See also* Alexander T. MacDonald, *Be Careful What You Wish For: The Risks of Competitive Labor Federalism for Pro-Union States*, Federalist Soc'y (June 2, 2025), https://fedsoc.org/commentary/fedsoc-blog/be-careful-what-you-wish-for-the-risks-of-competitive-labor-federalism-for-pro-union-states (describing how state efforts to erode the NLRB's exclusivity would lead to a competitive rush and further splintering of labor law).

commerce" and "considered that centralized administration of specially designed procedures was necessary to obtain uniform application of its substantive rules." *Garner*, 346 U.S. at 488.

In the decades since, union organizing, collective bargaining, and labor disputes have been subjects of purely national regulation. *See Bethlehem Steel Co. v. N.Y. State Lab. Rels. Bd.*, 330 U.S. 767, 771–72 (1947); *Hill v. State of Fla. ex rel. Watson*, 325 U.S. 538, 543 (1945). *See also Comm. of Interns & Residents*, 566 F.2d at 813 n.3. For much of the private-sector workforce, the NLRA occupies the labor-relations field. *See Garmon*, 359 U.S. at 244. It leaves no room for inconsistent, conflicting, or even supplemental state laws, , as the Supreme Court has recognized in numerous decisions.  It has repeatedly defined conduct that the Act protects and has delineated "the areas … withdrawn from state power."  *Weber v. Anheuser-Busch, Inc.*, 348 U.S. 468, 480 (1955); *see Garmon,*359 U.S. at 245 ("When an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the [NLRB] if the danger of state interference with national policy is to be averted.").

This broad preemptive scope is unusual but not accidental. It reflects deliberate choices made in response to specific historical circumstances. In 1935, lawmakers were facing a rising tide of labor unrest. Labor disputes had grown not only more common, but also more violent. From 1927 to 1932, there were on average 1,050 strikes per year affecting 775,000 workers. S. Rep. No. 573, at 69. But in 1933, there were 1,695 strikes affecting almost 1.2 million workers. *Id.* Those numbers rose again in 1934, hitting 1,856 strikes affecting almost 1.5 million workers. *Id.* Labor disputes were costing the national economy more than $1 billion in production per year (in 1934 dollars). *Id.* And in just two years, they had also cost more than 40 workers their lives. *See* Eric

Blanc, *Revisiting the Wagner Act & Its Causes*, Lab. Politics (July 28, 2022)[6] (reviewing casualty statistics). *See also* S. Rep. No. 573, at 70 (citing a "rising tide of labor disputes").

Congress reacted by passing the Wagner Act of 1935, the basis of what is now the NLRA. From the beginning, the statute was meant to be uniform, comprehensive, and exclusive. Congress saw labor disputes as a threat to interstate commerce—one that could cripple important industries like transportation, mining, and manufacturing. *See* S. Rep. No. 1184, at 10–11, 79th Cong., 2d Sess. (1934). These disputes had periodically crippled major transportation and supply chains, making the problem too large for any one state to control. *See id.* What was needed was a single, uniform way to keep labor peace. *See id.* (explaining that the Senate bill was designed to address "an ever-increasing stoppage of the free flow of commerce between the several States and between this and other countries as a result of disturbances in some of our larger industrial enterprise"). *See also* S. Rep. No. 573, at 69 (1935) ("The first object of the bill is to promote industrial peace.").

Accordingly, Congress created a system that was uniform not only in substance but in process. In substance, it adopted a national policy to encourage peaceful settlements through collective bargaining. *See* Pub. L. No. 74-198, § 1, 49 Stat. 449, 449 (1935) (codified at 29 U.S.C. § 151). And in process, it established a centralized administrator, the NLRB, with authority to conduct elections, certify representatives, and remedy violations. *Id.* §§ 9, 10, 49 Stat. at 453–54 (codified as amended at 29 U.S.C. §§ 159, 160). That authority allowed the NLRB to develop a cohesive policy for the whole nation—to the exclusion of local authorities:

> Section 10(a) gives the National Labor Relations Board exclusive jurisdiction to prevent and redress unfair labor practices, and, taken in conjunction with section 14, establishes clearly that this bill is paramount over other laws that might touch upon similar subject matters. Thus it is intended to dispel the confusion resulting dispersion of authority and to establish a single paramount administrative or quasi-judicial authority in connection with the development of the Federal American law regarding collective bargaining.

---

[6] Available online: https://www.laborpolitics.com/p/revisiting-the-wagner-act-and-its.

S. Rep. No. 573, at 85.

Over the years, however, Congress has made two exceptions to the NLRB's plenary authority, both times in response to Supreme Court decisions. First, in *Bethlehem Steel Co. v. New York State Labor Relations Board*, Congress allowed the NLRB to make cooperative agreements with state boards in some cases. *Bethlehem Steel* itself involved a group of foremen. At the time, the NLRB considered the foremen "employees" under the NLRA. But for policy reasons, it had declined to recognize their right to bargain collectively. In response, the foremen tried to organize through the New York State Labor Board. In *Bethlehem Steel*, the U.S. Supreme Court blocked the effort. 330 U.S. at 771–72, 776. It held that the state board had no jurisdiction over employees covered by the NLRA—even those for whom the NLRB declined to exercise its full authority— without some affirmative "delegation of power." *Id.* at 776.

Congress responded by authorizing just such a delegation. In section 10(a), it allowed the NLRB to cede control over some local employers and industries to a state agency. *See* Pub. L. 80-101, § 10, 61 Stat. 136, 146 (1947) (codified at 29 U.S.C. § 160(a)). But at the same time, Congress limited the universe of such possible delegations. It stipulated that any agreement with a state agency would be proper only if the state's labor law was fully consistent with the NLRA. *Id.* It also stipulated that the delegation could not cover certain industries important to national commerce, such as mining or manufacturing, unless the covered industry was "predominately local in character." *Id. See also* H.R. Rep. No. 510, at 52 (1947) (describing cooperative-agreement proviso in 10(a)).

Second, in response to *Guss v. Utah Labor Relations Board*, Congress allowed states to exercise authority in some cases when the NLRB affirmatively declines jurisdiction. In *Guss*, the Supreme Court had come to the opposite conclusion: it held that a state board could not exercise jurisdiction over covered employers and employees even when the Board had expressly declined

to exercise its own. 353 U.S. 1, 10–11 (1957). The Court recognized that its decision might create a "no-man's land," where the Board had declined jurisdiction and no state could fill the gap. *Id.* But even so, the Court concluded that this result was required by the NLRA itself. *Id.* The NLRA excluded all state regulatory activity within its sphere; and that exclusion was effective even when the NLRB declined to step in:

> We are told by appellee that to deny the State jurisdiction here will create a vast no-man's-land, subject to regulation by no agency or court. We are told by appellant that to grant jurisdiction would produce confusion and conflicts with federal policy. Unfortunately, both may be right. We believe, however, that Congress has expressed its judgment in favor of uniformity. Since Congress' power in the area of commerce among the States is plenary, its judgment must be respected whatever policy objections there may be to creation of a no-man's-land.

*Id.* Congress responded again, this time with section 14(c), in which it specified that the NLRB could, "in its discretion," decline to assert jurisdiction over a "class or category" of employers. 29 U.S.C. § 164(c). But again, there were conditions. The NLRB could decline jurisdiction only when the relevant employees had relatively little effect on interstate commerce. *See id.* Only then, and only after an affirmative decision by the NLRB, could a state "assum[e] and assert[]" jurisdiction. *See id.*

Today, Sections 10(a) and 14(c) serve different purposes. Section 10(a) allows cooperative agreements with state boards, while section 14(c) allows unilateral cessation by the NLRB. But both sections underline Congress's view of the NLRB's role. Congress has consistently treated the NLRB as the unitary administrator of national labor law. *See Garmon*, 359 U.S. at 242–43. And although it has allowed states to play a role in some limited cases, it has conditioned their involvement on the NLRB's consent. *See Comm. of Interns & Residents*, 566 F.2d at 813.

New York has no such consent. It has no agreement under section 10(a) or a declination under 14(c). Instead, it has simply assumed jurisdiction over employees, employers, and industries covered by the NLRA. *See* N.Y. Lab. Law § 715. In effect, it has done what Congress said it could

not do: it has seized jurisdiction on its own. *See Bethlehem Steel Co.*, 330 U.S. at 774 ("[A] state regulation in the field of the statute is invalid even though that particular phase of the subject has not been taken up by the federal agency."); *Guss*, 353 U.S. at 10–11. *See also Comm. of Interns & Residents*, 566 F.2d at 813 (concluding that sections 10(a) and 14(c) are the exclusive methods by which state boards may regulate activity otherwise within the NLRB's jurisdiction). In fact, far from consenting to New York's attempted assumption of jurisdiction, the NLRB ***has filed suit to enjoin*** section 715, as amended, on the grounds that it is preempted.

The state defends its power grab by pointing to the NLRB's current staffing. The NLRB, it says, currently has fewer than three confirmed members. The NLRB therefore lacks a statutory quorum and cannot perform its normal functions. *See* Sponsor Memo, S8034A (N.Y. 2025)[7] [hereinafter Sponsor Memo] ("Absent a quorum, the Board lacks the power to take meaningful actions, such as issuing decisions in representation and unfair labor practice cases.").[8]

That statement is true in part,[9] but also irrelevant. Although the NLRB may lack a quorum today, the presence or absence of a quorum changes nothing about the preemption analysis.

---

[7] Available online: https://www.nysenate.gov/legislation/bills/2025/S8034/amendment/A.

[8] This situation appears to be temporary, as two candidates have been nominated to fill vacant NLRB seats, and the U.S. Senate has scheduled hearings to consider their nominations. *See* Nominations of Scott Mayer to Be a Member of the National Labor Relations Board, James Murphey to Be a Member of the National Labor Relations Board, and Rosario Palmieri to Be Assistant Secretary of Labor for Policy, U.S. Senate Health, Educ., Lab. & Pensions Committee, https://www.help.senate.gov/hearings/nominations-of-scott-mayer-to-be-a-member-of-the-national-labor-relations-board-james-murphy-to-be-a-member-of-the-national-labor-relations-board-and-rosario-palmieri-to-be-assistant-secretary-of-labor-for-policy (setting hearing for Oct. 1, 2025).

[9] As the NLRB's Acting General Counsel has explained, even without a quorum, agency officials have continued to process much of the agency's day-to-day functions. *See* Press Release, Acting General Counsel Statement on Potential State Legislation Regulating Private Sector Labor Relations, NLRB Office of Pub. Affairs (Aug. 15, 2025), https://www.nlrb.gov/news-outreach/news-story/acting-general-counsel-statement-on-potential-state-legislation-regulating ("Notwithstanding the Board's lack of a quorum, agency operations are continuing to the greatest extent permitted by law). *See also* Order Delegating Authority to the General Counsel, 756 Fed.

The quorum requirement is a feature of Congressional design. From the beginning, the NLRB has been able to operate only with a statutory quorum. *See* Pub. L. No. 74-198, § 1, 49 Stat. 449, 449 (1935) (codified as amended at 29 U.S.C. § 153). The quorum was originally two members; later, it was raised to three. But throughout the NLRB's history, it has been a limit on the NLRB's power. *See New Process Steel, L.P. v. National Labor Relations Board*, 560 U.S. at 687–88 (2010). It has always meant that if the NLRB lost a quorum, the NLRB would be temporarily unable to perform some duties. *Id.* Congress never provided for that circumstance to allow states to step in. To the contrary, Congress established national uniformity even when the NLRB did not or could not act. *See Guss*, 353 U.S. at 11 ("Since Congress' power in the area of commerce among the States is plenary, its judgment must be respected whatever policy objections there may be to creation of a no-man's-land."). And until Congress says otherwise, the NLRA is the "supreme" federal labor law of the land—quorum or no. *See* U.S. Const. art. VI, cl. 2.

If Congress wants to deputize states when the NLRB lacks a quorum, it certainly knows how to do that. It has already carved out two exceptions allowing states to play such a role. But it has carved out no exception for when the NLRB lacks a quorum. Instead, it has repeatedly and consistently chosen uniformity over diversity. It has chosen to site "paramount" authority in a single administrator, to the exclusion of all others. S. Rep. No. 573, at 117. Congress has been clear; this Court should as well.

## 2. As amended, section 715 will sow chaos in national labor markets.

Against this weight of authority, New York defends its Amendments as a practical necessity. It says that without a quorum, the NLRB cannot "function." Sponsor Memo, *supra*. So to "protect employees," the state must step in and play the NLRB's role. *Id.*

---

Reg. 69768, 69768 (Nov. 9, 2011) (delegating functions to agency officials when NLRB lacks a quorum).

That view, however, is both wrong and dangerous. If accepted, it would undermine the stability provided by a uniform national system. It would also kick off a labor-law race, with states rushing to offer their own labor-law models. The result would be a crowd of different legal regimes—one that would run roughshod through national labor markets. *See Allis Chalmers*, 471 U.S. at 211 (describing risks of uncertainty and disparity without a uniform federal labor policy); *see also Garmon*, 359 U.S. at 246 ("The governing consideration is that to allow the States to control activities that are potentially subject to federal regulation involves too great a danger of conflict with national labor policy."). Following New York's lead, other states would be free to seize jurisdiction for their own local agencies. These agencies could develop their own rules—rules covering everything from strikes to picketing to the duty of bargain.[10] Nor would anything guarantee that these rules would be more protective of employee rights. Nothing in New York's logic requires a state to respect the NLRA as a minimum floor. Rather, it would allow states to design systems with greater rights or fewer. State experimentation can cut both ways—often in ways antithetical to the desires of its proponents. *See Comm. of Interns & Residents*, 566 F.2d at 815–16 (declining to find implicit authority for state agency to exercise jurisdiction) ("A contrary holding would have a number of damaging effects. Primary among them would be the introduction of disparity in a labor policy designed to be national in scope.").

That risk is not hypothetical: It is already here. In California alone, lawmakers are pushing to erode federal labor supremacy. Most recently, California lawmakers advanced their own version

---

[10] Indeed, New York itself diverges from the NLRA's scheme in important ways. For one, it allows the PERB to mediate and conciliate labor disputes—a role Congress explicitly rejected for the NLRB. *See* N.Y. Lab. Law § 702-a(1). Similarly, New York forbids employers from using state funds to "discourage an employee from participating in a union organizing drive"—a speech right Congress deliberately protected in the NLRA. *Compare* N.Y. Lab. Law § 704(11), *with* 29 U.S.C. § 158(c). *See also U.S. Chamber of Commerce*; *Comm. of Interns & Residents*, 566 F.2d at 815–16 (surveying conflicts between New York Labor Law and NLRA).

of section 715, which likewise purports to transfer the NLRB's duties to a state agency. *See* A.B. 288 (Cal. 2025) (enacted by the legislature on September 10, 2025). Before that, they adopted an alternative, quasi-sectoral bargaining regime for fast-food employees. *See* Cal. Lab. Code § 1475. And even now, they are on the verge of passing an expansive bargaining regime for rideshare drivers. *See* A.B. 1340 (Cal. 2025) (passed by the legislature on September 9).

The rideshare and fast-food laws show how far these schemes can stray. Under both laws, the state can designate a bargaining representative for workers without majority support from the workers themselves. *See* Cal. Lab. Code § 1475(a)(3)-(4); A.B. 1340, § 1 (establishing Cal. Lab. Code § 740.8(a)(1)(B)). Both laws also fail to guarantee a secret-ballot election. *Compare* 29 U.S.C. § 159(c); *NLRB v. Gissel Packing Co., Inc.*, 395 U.S. 575, 596 (1969) (noting the preference under federal law for certification by secret-ballot election). And neither law offers the due-process or transparency rights provided by federal labor law. *Compare* 29 U.S.C. § 411(a) (guaranteeing union member, speech, assembly, and equality rights), 414 (guaranteeing right to copies of agreements), 415 (mandating notice of rights).

This trend is unlikely to end with California or New York. It will continue until it is stopped—and it should be stopped here. This Court should hold that section 715, as amended, is preempted by the NLRA. Section 715 would allow a state board to regulate matters exclusively within the NLRB's jurisdiction. It cannot do that. These matters are governed by federal law and federal law alone. *See Garmon*, 359 U.S. at 244 ("Regardless of the mode adopted, to allow the States to control conduct which is the subject of national regulation would create potential frustration of national purposes.").

Counsel for amici contacted counsel for the parties to request consent to file this brief. Counsel for Plaintiff consented. Counsel for Defendant has not yet responded to the request.

Dated: September 30, 2025
      New York, New York

LITTLER MENDELSON P.C.

By:  /s/ *Eli Freedberg*
    Eli Freedberg
    900 Third Avenue, 8th Floor
    New York, NY 10022
    212.583.9600
    efreedberg@littler.com

    *Attorneys for Amici*